WILBUR JACKSON (c) *v.* STATE OF MARYLAND
FRANK WILLIAMS (c) *v.* SAME
FREEMAN HOLTON (c) *v.* SAME

[Nos. 9, 10 and 11, April Term, 1942.]

*Decided June 17, 1942.*

The cause was argued before BOND, C. J., SLOAN, DELAPLAINE, COLLINS, FORSYTHE, and MARBURY, JJ.

*William Curran* for appellant, Wilbur Jackson.

*Morton P. Fisher* for appellant, Frank Williams.

*E. Paul Mason* for appellant, Freeman Holton.

' *Robert E. Clapp, Jr., Assistant Attorney General,* and *Joseph G. Finnerty, Assistant State's Attorney of Baltimore City,* with whom were *William C. Walsh, Attorney General,* and *J. Bernard Wells, State's Attorney,* and *Douglas N. Sharretts, Assistant State's Attorney of Baltimore,* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

This appeal is from sentences of death imposed on the appellants, three young colored men, Wilbur Jackson, alias Will Jackson, Frank Williams, alias Zipp Williams, and Freeman Holton, all of whom had been jointly indicted and charged with the murder on August 4, 1941, of Louis Pertnoy. They did not ask for a severance and were jointly tried. They were without the financial ability to employ counsel, and the court appointed three able and experienced attorneys, who could not have given

better service for any amount of compensation. Not only that, they have paid for a large and expensive record at their own cost.

The case was tried by a jury. Thirty-one exceptions were taken during the trial, the first during the selection of the jury on a challenge to the array, the thirtieth and thirty-first to statements made by the State's Attorney, during his closing address to the jury, the others to rulings on the evidence.

During the selection of a jury, the jurors drawn for the criminal court had been exhausted, and panels from other courts had been called into the criminal court; and when the panel from the City Court, Part III, was being examined on their *voir dire,* counsel for defendants challenged the array, on the ground that the composition of the jury was in violation of the Federal and State Constitutions, counsel saying that, "Out of the whole fifty-two so far submitted, there were only two colored men." There is nothing else in the record concerning the personnel of the jury, and from this we are asked to declare that there was prejudice in the selection of the jury. It is argued that prejudice can be assumed from the presence as petit jurors of two colored men out of fifty-two, or one-twenty-fifth, in a city where about one-sixth of the population is colored; and from this alone we are asked to declare that there was prejudice` in the selection of the jury. Jurors are selected in Baltimore under and in accordance with Sections 687-711 of the Baltimore City Charter, 1938, Sections 602-620, Article 4, Code of Pub. Loc. Laws, 1930, and subject to the provisions of Sections 1-5, Article 51, Code, 1939. The judges of the Supreme Bench first select 750 "or thereabouts," from the tax and poll books. From these twenty-three are selected as grand jurors; of the remainder, 400 are selected by lot to serve on the several panels required for the term, and, in addition, 100 are selected subject to call if the business of the courts requires their services. The record does not contain any evidence that colored men were excluded, either from the grand jury or from the remain-

ing 700 or more from whom the petit jurors are drawn. Where the jurors are drawn by lot, no one can know what names will come out or on what juries any of those drawn will sit. In this case the complaint, on which the challenge was based, was that the names of two colored men had been submitted out of fifty-two called to that time. The composition of one panel cannot determine the question of prejudice; it is whether the large list out of which the juries are drawn shows that colored men are excluded because they are colored. *Bush v. Kentucky,* 107 U. S. 110, 1 S. Ct. 625, 27 L. Ed. 354; *Franklin v. South Carolina,* 218 U. S. 161, 30 S. Ct. 640, 54 L. Ed. 980; *Lee v. State,* 163 Md. 56, 64, 161 A. 284. It is not the mere fact that they are colored and their names omitted from the jury lists that determines the question of prejudice, but it must appear from some substantial evidence that the manner and practice of selecting jurors shows that they are intentionally excluded. When this appears, prejudice is inferred. *Neal v. Delaware,* 103 U. S. 370, 26 L. Ed. 567; *Norris v. Alabama.* 294 U. S. 587, 55 S. Ct. 579, 79 L. Ed. 1074; *Smith v. Texas,* 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84; *Pierre v. Louisiana,* 306 U. S. 354, 59 S. Ct. 536, 83 L. Ed. 757; *Lee v. State, supra.*

There is no evidence of prejudice in this record, and the challenge to the array was properly overruled.

Louis Pertnoy, the man who was murdered, on August 4, 1941, was acting as cashier at the Radio Theatre, on Eden Street, Baltimore, which was operated by his father. He left about 10.20 with the day's receipts, and headed for his automobile parked near the theatre. As he reached it, he threw a bag containing the money on the front seat; and as he was about to get in the car, he was held up, and the money demanded. Whether he refused or resisted doesn't appear, except that Williams is reported to have said that he shot a man; and if he had given the money he would not have shot him. Whoever did it was scared off and ran without getting the money, which was found on the front seat of the

car after Mr. Pertnoy had been shot, and escaped in an automobile which was driven by Jackson, and evidently stolen by him. Suspects were taken in by the police as found, and it was three days before the three defendants were found and arrested. The defendants, and other suspects, were all questioned at the Northeastern Police Station by Captain William J, Forrest, the questions and answers being taken and transcribed by police stenographers.

The statement of Jackson was interspersed by frequent, brief, statements from all of the other suspects, all of whom, including the defendants, excepting two, one called "Nusie Boy," one, James Ruff, testified at the trial. The statement of Holton was confined to an examination of him by the police captain. The first statement to get into the record was that made by Chase, the State's leading witness, and was introduced at the instance of Williams, obviously for the purpose of reflecting on his credibility, and to contradict statements he had testified to. Objections were made by the other defendants. The court then said to counsel objecting: "So far as your client is concerned, the paper is not in. It could not be in as to any of them, but Williams could not object as it was read into Chase's evidence, at his (Williams) instance."

The major part of the contentions of the defendants, and most strongly urged at the trial and in the argument on appeal, was to the introduction of the confessions of Jackson and Holton. Before they were received in evidence, the court, out of the presence of the jury, took evidence of the officers, of a police stenographer, and of the defendants, as to the voluntariness of the statements made by Jackson and Holton. They both testified that they had been assaulted by the officers with a piece of rubber hose, and cursed at and otherwise abused. Williams, who did not confess, said: "I had marks and scars on me (indicating). Jackson's mouth was bleeding. * * * I have marks now on my forehead, over my nose, on my right cheek, and a

big scar on my right eyelid. The only time I saw Jackson was at the captain's office. I don't know what they were doing in the captain's office. The lady was writing it down."

Captain Forrest, Sergeant McHale, Officer Roche, and James T. Holden, stenographer, whose evidence is all set out in the record, all denied that there were any threats or promises or that they had been beaten or abused. As Officer Roche said, "It wasn't necessary." Sergeant McHale said of Holton: "This boy just opened up and told everything." Two other sergeants and two other officers, whose testimony is not set out at length, according to the record, "testified that no threats, promises or inducements were made" to Jackson, and no violence committed on Jackson, while in their presence and custody.

A reading of the statements of Jackson and Holton shows very clearly that, because neither of them had fired the gun by which Pertnoy was killed, they were not as guilty as Williams, on whom they seemed to be anxious to fasten the murder, and they were not backward in telling all they knew.

The first defendant arrested was Holton. When he was brought into the captain's office, according to the captain and Sergeant McHale, the captain said: "Freeman, I am here to listen to anything you have to tell me." To which he replied: "I didn't do any shooting. Can't I be State's evidence?" The captain said he had "nothing to do with that" and "couldn't promise him anything." He "persisted that he didn't shoot the man." Asked if he knew who did, "he said Zip." Jackson made the same accusation in his statement.

It has been held in this court and many others, that it was not an improper inducement to tell a suspect that another had already made such a statement, even if not true. The innocent do not confess crimes they have not committed. As a rule, they only make them when they think they have the evidence of their guilt.

There is no contention that it is not the province of the court to pass upon the admissibility of the confessions. *Rasin v. State,* 153 Md. 431, 432, 441, 138 A. 338; *Biscoe v. State,* 67 Md. 6, 10, 8 A. 571; *Lubinski v. State,* 180 Md. 1, 22 A. 2d 455.

After hearing the officers and the defendants, the court admitted, first, the statement or confession of Holton, but, before it was read to the jury, the court, repeating what had already been said, said: "The court has already taken care of Jackson and Williams by telling the jury that this statement of Holton made out of their presence does not bind them or affect them," and again, on objection by Williams' attorney, said: "I will tell you and the jury that there is not a thing in that statement that can involve Jackson, who wasn't present, or Williams, who wasn't present part of the time, unless Williams admitted that it was true. If he remained silent or denied it, then he is out so far as his statement is concerned. He was not a free man. He was in the control of the police. He can't be responsible for standing mute. If he denied it, then it is not admissiblbe against him. If it admissible, it has to be affirmatively shown that he assented to it as being the truth." The record does not show that Williams was present when Holton's statement was made or signed, but Jackson's does show that he (Holton) was brought in when his (Jackson's) statement was nearly finished.

When Jackson's statement was offered, but before being read, the court said: "As regards your client, Holton, a statement made by Jackson would not bind Holton, and is not proof of any offense mentioned in the indictment against Holton. But admissions made by Holton are admissible as against Holton." Although Williams was present when Jackson said Williams "had shot the man," the court said "nothing that appears in that statement binds Frank Williams."

Although the evidence was heard out of the presence of the jury and the court alone decided its admissibility, the defendants were permitted to present to the jury

their version of everything that happened at the police station when Jackson and Holton made their statements, so that the jury had the same opportunity to pass on the voluntariness of the confessions, and whether induced by threats, promises and inducements as had the court, and by their verdict, gave the same answer.

The court could have stricken out the confessions, at any time after their introduction, "if satisfied, in the subsequent progress of the case, that it was not a free and voluntary confession, and may instruct the jury that it is not to be considered by them in determining the question as to the guilt or innocence of the prisoner." *Biscoe v. State*, 67 Md. 6, 10, 8 A. 571, 573; *Rasin v. State, supra.*

In arriving at this conclusion, the trial court was bound by the decision in *Markley v. State*, 173 Md. 309, 318, 196 A. 95, 99, wherein we said: "As to the additional objections of Markley and Wheeler, it is, of course, a rule that admissions or confessions of co-conspirators out of the presence of the objectors, and in no way authorized by them, would not be competent evidence against them, for they would not be statements or acts in furtherance of the conspiracy. 'One who makes no confession must be found guilty, if at all, only upon proof independent of a confession by a co-defendant.' 3 *Wharton, Criminal Evidence* (11th Ed.), 1215; *People v. Fisher*, 249 N. Y. 419, 164 N. E. 336; *State v. Huckins*, 212 Iowa 283, 234 N. W. 554. But when on trial the confessions are admissible against the confessing codefendants, those not confessing are entitled only to have the jury directed to exclude them as proof against themselves. It may be that the practical value of such a restriction is small, but it is the only remedy practicable on a joint trial. And here, Markley and Wheeler sought, as stated, to have not only the confessions, but other evidence along with them, excluded from the case entirely. The trial court's refusal to do so cannot be held erroneous. *United Railways & Electric Co. v. (Henry) Wehr & Co.*, 103 Md. 323, 337, 63 A. 475; *Packard Iron & Metal Co. v. H. P.*

*Pearl & Co.,* 139 Md. 498, 505, 115 A. 761," and unless we overrule it we must follow it, and we see no reason to overthrow it.

Another exception is to statements made by the Assistant State's Attorney in his closing argument to the jury. By stipulation the following is inserted in the record:

"Mr. Curran and Mr. Mason argued that it was a matter for the jury as to whether or not they believed the so-called confessions of Holton and Jackson in the light of their repudiation by Holton and Jackson and the testimony of Holton and Jackson that they had been obtained by force and threats.

"Thereupon Mr. Sharretts in the closing argument for the State argued to the jury in substance that the burden of proof was on the State to show that the confessions had been procured without duress, threats, violence or fraud. He further argued that the admissibility of the confessions in evidence was a matter for the court to pass upon; that what weight was to be given them was solely for the jury; that the State had produced its evidence before the court while the jury were out of the room, and that the court had likewise heard the testimony of the defendants also while the jury was out; that the court, after hearing the testimony, ruled that the confessions had not been obtained by threats, violence or duress, and that without this ruling by the court, the jury would never have heard the confessions," to which the defendants objected; and their objections being overruled, the thirtieth exception was taken.

The remarks of the State's Attorney, objected to, are fully supported by the cases of *Biscoe v. State, supra,* and *Rasin v. State, supra; Jules v. State,* 85 Md. 305, 313, 36 A. 1027; *Deibert v. State,* 150 Md. 687, 695, 133 A. 847.

In this case the jury had the same opportunity to pass on the admissibility of the confessions, without objection from either side, as had the court out of their presence.

The thirty-first and last exception was to a statement of the State's Attorney, as follows:

"The State's Attorney is bound to make certain proof to the court before it is admissible, and that is this— the Court of Appeals has said: 'The question of the admissibility of testimony is always for the court, and the rule is where a confession of a prisoner on trial is offered against him, the court, and not the jury, ought to determine whether it is admissible.' The rule is thus stated in *Taylor, on Evidence,* Section 22: "If, says the author, the question be whether a confession should be excluded on account of some previous threat or promise, the judge must first decide whether the threat or promise was really made; and secondly, whether, if made, it was sufficient in law to warrant the exclusion of the evidence.' Is that clear, gentlemen? I can read you more pages if you want to. I will read you one more. Here they were discussing a civil rule: 'That rule cannot apply to a criminal case, for in passing upon the preliminary question of the admissibility of a confession made by a prisoner, if the court considers it doubtful whether it ought to be admitted, it should be rejected'."

We do not consider this an unfair or improper argument by the State. In this State ᐧ(Art. 15, Sec. 5 of the Constitution) the jury are the judges "of law as well as of fact" in all criminal cases. The judge may tell them what he thinks the law is, but he must tell them it is merely advisory and they are not bound to follow it, and any erroneous advice or opinion given or expressed by him will be ground of reversal.

Courts in this State very infrequently advise or instruct the jury in criminal cases, and juries generally must depend upon counsel to give them the law, or their view of it. As Judge Johnson said, in *Wilkerson v. State,* 171 Md. 287, 291, 188 A. 813, 814: "It is difficult to understand how they are to know the law in any particular case if counsel are to be denied the privilege of stating it to them, for the court will take judicial knowledge of the fact that most jurors are laymen, and there-

fore do not possess knowledge of the law," in spite of the theory or maxim that everyone is presumed to know the law. *Davis v. State,* 168 Md. 10, 12, 176 A. 281.

The exceptions here discussed were those on which the defendants, in their brief, and at the argument seemed to depend, and, as indicated, we do not disagree with the rulings of the trial judge, and as to the others, not so strongly pressed, we find no error. The judgments appealed from, should therefore, in our opinion, be affirmed.

*Judgments affirmed, with costs.*